UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                          :

UNITED STATES OF AMERICA           :

                                          :

   - v. -                          :

                                          :     S1 20 Cr. 470 (PKC)

KENNETH WYNDER, JR., and   :

ANDREW BROWN, a/k/a "Drew Brown,"   :

                                          :

         Defendants.         :

                                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## THE GOVERNMENT'S BRIEF IN OPPOSITION TO SANCTIONS

 

 

                                         DAMIAN WILLIAMS
                                         United States Attorney
                                         Southern District of New York

David Raymond Lewis
Eli J. Mark
Kedar S. Bhatia
Assistant United States Attorneys
      - Of Counsel -

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND .............................................................................................................. 2

I.   The Indictment and Discovery ............................................................................. 2

II.  The First Discovery Error: Late Production of Documents from the Koenig Firm that Inadvertently Were not Initially Downloaded ................................................................. 4

     A.   Inadvertent Failure to Download the Koenig Series in November 2019 ............... 5

     B.   The AUSAs' Discovery of the Koenig Series Error, and Immediate Remediation 6

III. The Second Discovery Error: Accidental Omission of the LEEBA Subpoena Returns from the Discovery Initially Provided to Defendant Brown ............................................... 8

     A.   The Initial Production to Wynder and Whittick in November 2020 ..................... 8

     B.   The Production to Brown in July 2021, After He Had Been Added to the Indictment .................................................................................................... 11

     C.   The Government Learns of the Omission of the LEEBA Subpoena Returns from the July 2021 Production to Brown ................................................................. 12

IV.  The Third Discovery Error: Accidental Oversight of the LEEBA Computer Search Warrant Files, Which Had Been Prepared for Discovery ............................................... 13

     A.   The Accidental Failure to Copy and Produce the LEEBA Computer Search Warrant Files ............................................................................................... 13

     B.   The AUSAs Uncover the Error Regarding the LEEBA Computer Search Warrant Files and Immediately Produce the Materials to the Defendants and Notify the Court ......................................................................................................... 15

V.   The June 30, 2022 Court Hearing on Discovery Errors .................................................. 16

ARGUMENT ................................................................................................................ 17

I.   No Further Sanctions Beyond the Adjournment Already Ordered by the Court are Appropriate Under Rule 16 ................................................................................ 17

     A.   Applicable Law ............................................................................................. 17

     B.   Discussion .................................................................................................... 19

II.  No Further Sanctions Beyond the Adjournment Already Ordered by the Court Are Appropriate Under Rule 5(f) .............................................................................. 27

     A.   Background and Applicable Law ..................................................................... 27

     B.   Discussion .................................................................................................... 29

III. A Referral to the District's Grievance Committee Is Not Appropriate Because the AUSAs Did Not Fail to Meet Their Ethical Responsibilities ......................................... 32

     A.   Applicable Law ............................................................................................. 32

     B.   Discussion .................................................................................................... 33

CONCLUSION .............................................................................................................. 35

## PRELIMINARY STATEMENT

The Government respectfully submits this brief in response to the Court's oral order of June 30, 2022, directing the Government to address whether errors related to the late production of Rule 16 discovery in this case warrant sanctions and, if so, what sanctions.

The Assistant United States Attorneys in this case oversaw a discovery process that resulted in three production errors with significant consequences. The Government—and more specifically, the assigned AUSAs—regret those errors. Once the Government realized the errors, the AUSAs swiftly and forthrightly disclosed them to the defense and the Court, and also took immediate remedial steps to correct them.

Indeed, the Government had intended to make a full production of discovery to each defendant, and not to forgo or withhold production of any material. Nor were the errors the result of bad faith. Rather, they were caused by inadvertent human and systemic errors within a complex, voluminous production process. Moreover, the Government will take further remedial steps to mitigate any prejudice from the late production, including by identifying certain documents for the defense and by providing early production of both the remaining 3500 material and an exhibit list four weeks before the new trial date of March 6, 2023.

In addition, to reduce the possibility that similar errors may occur again in other cases, the Office will be and has been making efforts to improve processes through increased technology, expertise, and training, focusing on bettering processes for tracking and producing discovery. In this connection, the AUSAs involved in the relevant discovery in this case already have given a

presentation to the Unit in which this case resides to discuss the errors and "lessons learned," and plan to have similar discussions with other Units and/or Unit Chiefs.

Under these circumstances, the Government submits that no further sanctions—beyond the eight-month delay of the trial already ordered—are appropriate here.

## BACKGROUND

The Court is familiar with the underlying facts surrounding the three discovery errors at issue from the Government's prior letters. Here, the Government sets forth the facts relevant to the Court's determination of the appropriateness of sanctions, including with respect to the AUSAs' supervision of the paralegals and information technology ("IT") litigation-support staff assigned to this matter. To be clear, the assigned AUSAs take full responsibility for the discovery errors in this case and for uncovering those issues only at a late date.[1]

### I.    The Indictment and Discovery

On July 13, 2020, defendants Kenneth Wynder, Jr. and Steven Whittick were arrested pursuant to criminal complaints, and on September 8, 2020, Wynder and Whittick were indicted. On July 21, 2021, shortly after Whittick pled guilty to the original indictment, the Superseding Indictment was unsealed, reiterating the charges against Wynder and adding Andrew Brown as a defendant.[2]

---

[1]    From initial investigation through the present, the assigned AUSAs were David Raymond Lewis and Eli J. Mark. AUSA Kedar S. Bhatia was added to the prosecution team in March 2022. Many of the facts detailed herein, and each of the three discovery errors at issue here, predate AUSA Bhatia's involvement in this case.

[2]    As the Court is aware from other motions, defendant Brown was initially proffering with the Government over a period of months, prior to and during the pendency of the initial charges against Wynder and Whittick. After Brown and the Government failed to come to any agreement, Brown was arrested and charged. As a result, and as detailed further below, defendant Wynder received the first nine discovery productions in this case prior to Brown's receipt of them.

The Government has made 36 discovery productions to the defendants since September 2020, all of which were accompanied with cover letters and a detailed, comprehensive index. (*See, e.g.*, Exhibit 1 (Discovery Index, dated July 1, 2022).) Beginning before defendants Wynder and Whittick were indicted in September 2020, the assigned AUSAs supervised the then-assigned paralegal, until approximately September 10, 2021 ("Paralegal-1"),[3] in collecting, preparing, and producing materials for discovery. As noted below, with respect to the discovery productions at issue here, the AUSAs gave specific instructions to Paralegal-1 to prepare each relevant production, and Paralegal-1 in turn worked with other technical personnel in and outside the U.S. Attorney's Office to prepare, copy, and load materials for production. Those personnel included IT specialists with the Office's litigation support department; an outside vendor who maintained the Relativity document review platform (the "Relativity Vendor");[4] as well the Office's law enforcement partners at the Federal Bureau of Investigation ("FBI") and the U.S. Department of Labor, who assisted in collecting and preparing discovery for future production.

The discovery productions were drawn from materials the Government obtained during its investigation, which remained ongoing following the initial indictment of defendants Whittick and Wynder in September 2020. Throughout the investigation, the Government and its law enforcement partners received subpoena returns totaling more than 150 separate productions from more than seventy sources, including the union Law Enforcement Employees Benevolent Association ("LEEBA" and the "LEEBA Subpoena Returns"), and the union's accounting firm

---

[3]    Paralegal-1 left the Office in September 2021, after which another paralegal was assigned to this case.

[4]    Relativity is a commonly used online eDiscovery platform that the U.S. Attorney's Office and private law firms utilize to store, review, categorize, sort, and prepare for production certain types of voluminous materials, including large subpoena and email productions.

- 3 -

formerly known as S.A. Koenig & Associates (the "Koenig Firm"). The Government also obtained search warrants for LEEBA's offices and defendant Wynder's and Whittick's cellphones.

The Government undertook a number of steps to ensure that materials were properly saved and cataloged for discovery productions. The AUSAs worked with Paralegal-1 to save subpoena responses in an organized fashion as they were received—specifically, in a folder in the case's internal shared computer drive that contained grand jury materials, with separate subfolders for each custodian, and further subfolders for each specific production. The AUSAs worked to review the subpoena responses as they were received to ensure completeness, frequently following up with subpoena respondents on formatting and production issues and obtaining additional materials that were not initially produced. At times this included requesting re-productions where subpoena respondents had made errors in the form of their productions or where redactions had been applied inappropriately. Paralegal-1 also maintained a log to track the subpoenas issued in this matter, as well as the responses received, and where those responses were stored.[5]

## II.    The First Discovery Error: Late Production of Documents from the Koenig Firm that Inadvertently Were not Initially Downloaded

The first discovery error arose pre-indictment, after the AUSAs serially directed a paralegal to download document production from the Koenig Firm. With respect to one of those productions, the paralegal did not implement those instructions, and the AUSAs did not notice the omission, despite regular reviews of the discovery, until four weeks before trial.

---

[5]    Paralegal-1 maintained this subpoena log through on or about the return of the initial indictment, when the initial discovery was produced. Subpoenaed materials received after that date were serially prepared for discovery and produced after they were received.

**A. Inadvertent Failure to Download the Koenig Series in November 2019**

Between October 7, 2019 and June 8, 2021, the Koenig Firm made six productions to the Government, in response to two subpoenas issued in September 2019 and February 2020. The Koenig Firm's productions were provided via emails containing links to an internet site to be used to securely download the documents. In each case, the assigned AUSAs forwarded the emails from the Koenig Firm's counsel to Paralegal-1, with instructions to download the documents and file them with the other subpoena returns that were being collected for review and discovery production. The AUSAs also reviewed the downloaded materials and repeatedly followed-up with counsel for the Koenig Firm with questions about the productions, the scope of the materials searched in response to the subpoena, and to provide further directions about the format of the productions (including to request a re-production when the Koenig Firm's production was not in a format that could be properly uploaded to Relativity for further review), in order to ensure complete compliance with the subpoenas.

The Koenig Firm made its fourth production on November 15, 2019, by sending an email to the AUSAs with a secure internet link to download the relevant documents. The AUSAs then forwarded that email to Paralegal-1 with a written instruction to download the materials and save them to the internal shared drive. In this single instance, however, Paralegal-1 did not carry out the AUSAs' instructions, and in conducting further reviews of the materials received from the Koenig Firm, the AUSAs did not notice that this fourth production from the Koenig Firm (the "Koenig Series") had not been properly downloaded. The AUSAs in preparing for discovery instructed Paralegal-1 to prepare all of the subpoena returns in the case file for production,

including the materials received from the Koenig Firm, and Paralegal-1 followed those instructions.[6]

### B. The AUSAs' Discovery of the Koenig Series Error, And Immediate Remediation

Late on the evening of June 13, 2022, in reviewing discovery in this case in preparation for trial, the AUSAs realized that the Government did not have in its possession the fourth Koenig production (*i.e.*, the Koenig Series), and that those materials had therefore not been included in the Government's production of discovery. The next day, the AUSAs asked the Koenig Firm's counsel to reproduce a secure internet link to permit the Government to download the Koenig Series, and within hours the Government produced the Koenig Series to the defendants. In producing the Koenig Series to the defendants on June 14, 2022, the Government identified the materials as newly produced and explained the nature of the Government's error:

> The production from the Koenig CPAs firm [*i.e.*, the Koenig Series] consists of database-loadable documents that the Government obtained for the first time today. The Koenig CPAs firm originally transmitted an internet link for those documents to the Government in November 2019. Inadvertently, however, that link was never downloaded. Upon discovering the error late last night, the Government earlier today asked Koenig CPAs to retransmit the link, which they did. Accordingly, the Government received these documents for the first time today, and is producing them today.

(See Exhibit 2 (Gov't Letter, June 14, 2022).)

---

[6]    All of the materials from the Koenig Firm that were downloaded were properly placed in the Office's internal shared drive in the folder for subpoena responses from the Koenig Firm. As a result, all of the Koenig documents from the other productions were produced to the defendants (initially to Wynder and Whittick, and later to Brown following the superseding indictment). Because of the downloading oversight regarding the fourth production (*i.e.*, the Koenig Series), that production was not downloaded, and the Government was not in possession of those materials at the time discovery was made.

On June 17, 2022, defendant Wynder filed a letter motion seeking to adjourn the scheduled July 13, 2022 trial date until a date after Labor Day, as a result of the newly produced Koenig Series. (*See* Wynder Letter, June 17, 2022 (Dkt. No. 119).) By letter the next day, the Government opposed the adjournment request, explaining that "the Government regrets its inadvertent failure to download them [the Koenig Series] when they were first made available by Koenig CPAs," but that the Government believed these materials did not "represent a significant obstacle to appropriate trial preparation," because the AUSAs believed (mistakenly) that "it appears that a large number of the latest materials from Koenig CPAs were already obtained by the Government from other sources and were already produced by the Government in earlier productions, including records obtained through search warrants and other subpoenas, which included the entire contents of LEEBA's computer and office." (Gov't Letter, June 18, 2022 (Dkt. No. 123).)

On the afternoon of June 21, 2022, the Court issued an order for the Government to provide forthwith, in relevant part, "a good faith estimate of (1) the quantity (by number or percentage) of the new production that had been previously produced and when that prior production was made." (Dkt. No. 126.) Later that evening, the AUSAs explained that based on the Government's manual and computer analysis of the newly produced material, the Government believed that "approximately 70% of the Production has been previously produced" from LEEBA and other sources, which "productions were made shortly after the respective indictments." (Gov't Letter, June 21, 2022 (Dkt. No. 127).) The Government's representations about the Koenig Series being duplicates of other previously produced materials were based on the AUSAs' good-faith but mistaken belief that the Government had previously produced all of the subpoena returns from LEEBA (including the LEEBA Subpoena Returns) and all of the materials obtained through search warrants (including the LEEBA Computer Search Warrant Files, as defined below) as the

Government had intended. (*See* Exhibits 3 & 4 (Gov't Letters of June 27 & 29, 2022 (Dkt. Nos. 130, 132)).)

Relying on the mistaken representation in the Government's letter of June 21, the Court denied Wynder's motion for an adjournment explaining, in pertinent part:

> The Court is persuaded that the late production of Rule 16 material works no substantial hardship or prejudice to either defendant. The government's explanation is plausible, though highly regrettable, and does not bespeak of bad faith. The quantity of new material is in actuality much less than suggested by the defendants' initial reports.

(Order, June 22, 2022 (Dkt No. 128).) As discussed further below, within hours of the AUSAs discovering that their representations about the materials being duplicates of previously produced materials were not accurate (because those materials had not been included in those productions as intended and as the AUSAs believed), the AUSAs filed a letter with the Court to correct these mistaken statements and to change the Government's position regarding the defendant's adjournment request (*see* Exhibit 3 (Dkt. No. 130)), and the AUSAs also reached out to defense counsel to discuss a path forward.

### III. The Second Discovery Error: Accidental Omission of the LEEBA Subpoena Returns from the Discovery Initially Provided to Defendant Brown

The second discovery error occurred in July 2021, after the Superseding Indictment added defendant Brown to the case and the Government sought to provide to Brown a copy of all discovery productions previously provided to defendants Wynder and Whittick. Because the second discovery error relates to the mechanics of how the initial production to Wynder and Whittick was prepared, the Government sets forth the relevant details.

### A. The Initial Production to Wynder and Whittick in November 2020

On November 17, 2020, the Government made its first discovery production in this case to defendants Wynder and Whittick ("Production 1"), which included the LEEBA Subpoena Returns.

- 8 -

Production 1 comprised over 100 different categories of materials. As relevant here, Production 1 included the LEEBA Subpoena Returns, which totaled approximately 159,134 documents and approximately 335,222 pages, comprising the first three productions of subpoena responses from LEEBA. The AUSAs supervised Paralegal-1 in preparing Production-1. As relevant here, in October 2020, the AUSAs instructed Paralegal-1 to work with an IT specialist in the Office's litigation support department ("IT Specialist-1"), who in turn worked with the Relativity Vendor to export six categories of materials (including the LEEBA Subpoena Returns and five other categories of subpoena responses) from the Relativity platform, to prepare discovery for the defendants. In addition to being maintained on Relativity, all but one of the six categories of materials were also maintained on the Office's internal shared drive within folders for grand jury subpoena responses. Responses that are particularly voluminous, per standing requests and recommendations from the Office's IT Department, are typically saved not on the Office's shared drive, because of space limitations, but are instead saved on external hard drives or flash drives, as happened here. In such cases, the AUSAs instructed Paralegal-1 to maintain notes in the folders of the shared drive, functioning as signposts indicating when those materials were on external hard drives.

IT Specialist-1, working with the Relativity Vendor, Bates-stamped and exported five of the six categories of materials requested to be exported by the AUSAs directly to the Office's internal shared drive, to a folder named "Exports from Relativity." However, given the large size of the materials from the sixth category of documents (*i.e.*, the LEEBA Subpoena Returns), Paralegal-1 requested that the Relativity Vendor load the LEEBA Subpoena Returns onto a hard drive, instead. Paralegal-1 obtained a hard drive for that purpose and shipped it to the Relativity Vendor so that all six categories of the materials, including the LEEBA Subpoena Returns, could

be exported onto that hard drive (the "Internal Hard Drive"). The outside Relativity Vendor then exported all six categories of documents, including the LEEBA Subpoena Returns, onto the Internal Hard Drive, and then shipped the Internal Hard Drive back to the Office. Unfortunately, neither Paralegal-1 nor IT-Specialist-1 made a note in the "Exports from Relativity" folder that the material on the shared drive was not the full set of materials (and that only the Internal Hard Drive had the complete export), Also unfortunately, the AUSAs did not notice this omission, which proved critical in the subsequent process of re-producing the discovery to Brown.

Because Paralegal-1 was working remotely during the COVID-19 pandemic, she asked a different paralegal who was able to come into the Office ("Paralegal-2"), to collect the Internal Hard Drive and work with the IT Department to copy the Internal Hard Drive onto other hard drives provided by defendants Wynder and Whittick for the purpose of receiving discovery, which Paralegal-2 did.[7] Paralegal-2 maintained the Internal Hard Drive in his own office but had no further involvement in the case.

---

[7]    As the Court is aware, defendant Wynder's counsel recently questioned whether the LEEBA Subpoena Returns were included on the hard drive containing Production 1 that the Government provided to Wynder in November 2020. But Wynder's counsel also has represented that he is no longer able to access that hard drive, so that assertion cannot be verified. Moreover, the Government's subsequent investigation strongly indicates that Production 1 included the LEEBA Subpoena Returns. As noted above, the Government instructed Paralegal-1 to include the LEEBA Subpoena Returns in Production-1. The Internal Hard Drive that was used by the IT Department to make the copies of the production for defendants Wynder and Whittick also includes the LEEBA Subpoena Returns, thus further indicating that the LEEBA Subpoena Returns were properly included in Production 1 to Wynder.

In any event, on the day that Wynder's counsel for the first time informed the Government that he did not believe he had these materials, the Government immediately worked to re-produce them, -sending them to Wynder's counsel the next day, irrespective of the Government's belief that those materials had properly been included in Production 1 more than nineteen months earlier.

### B. The Production to Brown in July 2021, After He Had Been Added to the Indictment

In July 2021, the Government provided three discovery productions to defendant Brown following his addition as a defendant in the Indictment—Productions 10, 10A, and 10B. The intent was to produce to Brown all the material that the other two defendants had already received.

With Production 10, on July 22, 2021, the Government provided Brown with all discovery letters previously provided to defendant Wynder, including the cover letter for Production 1, as well as an up-to-date discovery index that was intended to list all the discovery the Government was producing to Brown. (Exhibits 5 (cover letter for Production 1, dated Nov. 17, 2022) and 6 (discovery index of July 22, 2021.) Both that index and the Production 1 cover letter listed the LEEBA Subpoena Returns as having been produced, and gave the Bates number range for those documents. Meanwhile, with Production 10A, made available on July 29, 2021, the Government provided Brown with a hard drive with what the Government believed contained all prior discovery produced in the case, including the LEEBA Subpoena Returns. That belief turned out to be in error with regards to the LEEBA Subpoena Returns, as described below.

In preparation for this initial July 29, 2021 production of discovery to defendant Brown, the AUSAs instructed Paralegal-1 to make copies of all of the prior discovery productions in this case (*i.e.*, Productions 1 through 9, except to the extent those productions included materials intended solely for a particular defendant), in order to include them in Production 10A to Brown. With respect to Production 1, the AUSAs instructed Paralegal-1 to ensure that the production included materials that were previously exported from Relativity for purposes of the initial productions to Wynder and Whittick. Unfortunately, Paralegal-1 and the AUSAs overlooked the fact that the "Exports from Relativity" folder that Paralegal-1 used to produce those materials for defendant Brown did not contain the LEEBA Subpoena Returns that were on the Relativity

- 11 -

platform, because those materials had only been exported on to the Internal Hard Drive in Paralegal-2's office and not to the internal shared drive (because of their size, as noted above). As a result, even though the AUSAs intended for the Government to provide defendant Brown a full set of all discovery materials previously produced in this case, including the LEEBA Subpoena Returns, and had provided a list of the materials that the Government believed were included in that production, the hard drive provided to Brown accidentally omitted those returns.

### C. The Government Learns of the Omission of the LEEBA Subpoena Returns from the July 2021 Production to Brown

The AUSAs did not know that the LEEBA Subpoena Returns had been omitted from the July 2021 materials produced to Brown, until eleven months later, on June 27, 2022, when Brown's counsel informed the Government that these materials were not included in the prior productions.[8] The Government immediately that same day copied and sent, by overnight delivery, the LEEBA Subpoena Returns to Brown's counsel.

Also that same day, by letter dated June 27, 2022 (Exhibit 3 (Dkt. No. 130), the AUSAs informed the Court of the Government's reproduction error. That letter also made clear that the error—and the fact that the Government had been previously unaware of the error—meant that certain of the Government's representations to the Court in letters dated June 18 and 21, 2022 had been inaccurate in stating that the Koenig Series had been previously produced in the earlier

---

[8]     Late on Friday, June 24, 2022, while negotiating agreements to stipulations for the authenticity of materials, including the LEEBA Subpoena Returns, Brown's counsel informed the Government for the first time that counsel was not sure that their discovery materials included the LEEBA Subpoena Returns. The AUSAs took immediate steps to prepare for production what was believed to be a duplicate set of these materials. On Monday, June 27, Brown's counsel informed the Government for the first time that the hard drive on which we had originally been provided Production 10A in fact did not include the LEEBA Subpoena Returns. The AUSAs immediately examined an internal duplicate copy of the original Production 10A to Brown and determined that Brown's counsel was correct, and that Production 10A had not included the LEEBA Series even though it was supposed to have been included with that production.

discovery to the defendants, when in fact Brown had not previously received the LEEBA Subpoena

Returns (or, as discussed below, the LEEBA Computer Search Warrant Files).

**IV.    The Third Discovery Error: Accidental Oversight of the LEEBA Computer Search Warrant Files, Which Had Been Prepared for Discovery**

The third and final discovery error was the Government's failure to produce a set of

electronic files of responsive materials obtained from a search of LEEBA's office computer (the

"LEEBA Computer Search Warrant Files") that the Government had reviewed twice in

anticipation of their later production, and had set aside for the specific purpose of producing them

in discovery. This error came to light late on the evening of June 28, 2022, as the AUSAs engaged

in a full re-examination of prior discovery productions to ensure that everything the AUSAs

believed had been produced had in fact been produced. The next day, June 29, 2022, the

Government provided copies of the inadvertently omitted discovery to each defendant, and the

AUSAs immediately wrote to the Court (Exhibit 4 (Dkt. No. 132)), providing a detailed disclosure

of the Government's errors and the potential consequences to the defendant's trial preparation.

**A. The Accidental Failure to Copy and Produce the LEEBA Computer Search Warrant Files**

In September 2019, the Government executed a search warrant at LEEBA's Manhattan

office. In preparation for Production-1, the Government reviewed and produced a variety of items

related to the search, including numerous hard-copy documents such as binders and ledgers,

photographs, audio files, the contents of an electronic flash drive, and the underlying application

and warrant documents. The Government also reviewed and prepared for production electronic

documents that were found on a laptop computer in LEEBA's offices—the LEEBA Computer

Search Warrant Files. The AUSAs directed Paralegal-1 to work with IT Specialist-1, who in turn

worked with the Relativity Vendor, to ensure those files were first copied onto the Relativity

- 13 -

platform, where they were reviewed for privilege by a filter team, then reviewed by the case agents to identify documents responsive to the search warrant.

After this process was completed, in August 2020, the AUSAs directed Paralegal-1 to have IT Specialist-1 work with the Relativity Vendor to export a full copy of the responsive set of LEEBA Computer Search Warrant Files to the Office's internal shared directory for this case so the files could be provided in discovery if and when the case was indicted. This step was completed on September 1, 2020, and IT Specialist-1 copied those materials into a folder she created titled "Export from Relativity" (which was also the location discussed above where some of the other Relativity exports of subpoena returns were later saved).[9] However, when discovery was later prepared for copying and production, this particular folder was inadvertently overlooked for inclusion in the discovery productions, and so not copied to the case folder titled "Discovery," in which discovery productions were collected, organized, and saved.

In November 2020, as the Government prepared its initial discovery production, the AUSAs conducted a careful review for discovery materials, examining the internal shared drive, materials stored on Relativity, and materials stored on other electronic media, including hard drives supplied by subpoena recipients. However, both the AUSAs and Paralegal-1, who was assisting in this discovery production, inadvertently overlooked inclusion of the LEEBA Computer Search Warrant Files, which, as noted above, had been placed by the IT Department in a folder created by that department, rather than in the place where the AUSAs and Paralegal-1 ordinarily saved search

---

[9]   In hindsight, as evidenced by the fact that two of the errors here involved materials saved to the "Export from Relativity" folder created and used by IT department personnel, this folder proved particularly problematic for purposes of discovery in this case. As is now clear, it would have been far better if the materials saved here were immediately copied from that location to a different location within the shared drive where the AUSAs and Paralegal-1 normally saved and organized discovery materials. This is a lesson that the AUSAs, litigation support staff, and the Office have drawn from this case.

warrant files. For this reason, the LEEBA Search Warrant Files were not included in the initial collection of documents. Nor was that omission identified when discovery materials were periodically re-reviewed by the AUSAs as part of their continuing efforts to ensure that all discoverable materials were produced. All of the other relevant materials from the search of LEEBA's offices were produced timely.

### B. The AUSAs Uncover the Error Regarding the LEEBA Computer Search Warrant Files and Immediately Produce the Materials to the Defendants and Notify the Court

The AUSAs did not notice this omission, and continued to believe that all materials from the search warrant had been produced as intended, until near midnight on the evening of June 28, 2022. The next day, the Government immediately made and produced copies of the LEEBA Computer Search Warrant Files to the defense, noting the production error.

Also on the same day, June 29, 2022, the Government immediately informed the Court of this third error in copying discovery. (Exhibit 4 (Dkt. No. 132).) The Government explained:

> The results of the Government's investigation of earlier this week, as outlined above, prompted the Government yesterday to re-examine every detail of our processes for preparing and producing discovery over the past two and one-half years.
>
> *    *    *
>
> Our re-examination yesterday led us to uncover an additional set of documents that have not been properly included in the Government's discovery to date. This newly discovered set of omitted documents [the "LEEBA Computer Search Warrant Files"] consists of a specific set of approximately 17,311 computer files, totaling approximately 40,000 pages, that were among the items seized in the course of a search warrant exercised at the premises of LEEBA on September 18, 2019, and identified as responsive to that search warrant by Federal Bureau of Investigation ("FBI") personnel.

(*Id.* at 3-4.)

- 15 -

### V.    The June 30, 2022 Court Hearing on Discovery Errors

Pursuant to the Court's order of June 28, 2022 (Dkt. No. 131), the parties appeared for a conference before the Court on June 30, 2022. The Government was represented by AUSAs David Raymond Lewis and Eli J. Mark, who had been in charge of this case through the discovery phases relevant here, as well as by Associate U.S. Attorney Karl Metzner, a member of the U.S. Attorney's Office's executive staff appearing as the designee of the Chief of the Criminal Division. During the conference, the Government explained the nature of the discovery errors in this case; expressed its deep regret for those errors; and affirmed its commitment, as an Office, to "promise . . . to do whatever is in our power to prevent this from happening" again. (June 30, 2022 Tr. 24.)

The Court and counsel for both defendants all stated that there was no evidence of any bad faith on the part of the Government. Wynder's counsel explained he was "not accusing [the AUSAs] of bad faith" (*id.* at 29), and the Court stated, "I understand that. There's not evidence of bad faith" (*id.* at 30). Defendant Brown's counsel, while expressing frustration with the late disclosure of Rule 16 material, also added "[i]n no way do I think that the government had bad faith or intentionally withheld documents, and there's no evidence of that." (*Id.* at 38.)

The Court then suggested, to get the "ball rolling on the other avenues of relief," that the Court would look first to the warnings that the Court had issued under Rule 5(f) of the Federal Rules of Criminal Procedure, as is now required in every case. The Court stated the various forms of relief available under the Court's Rule 5(f) order, including "ordering production of the information" (although the Court noted that that did not apply, presumably because the Government had already produced the discovery at issue), "a continuance," "evidentiary sanctions," "impose sanctions on any responsible lawyer for the government," or "dismiss charges … or enter any other order that is just under the circumstances." (Tr. 41.) The Court ordered "the government, within 21 days, to submit briefing on whether there should be a sanction imposed,

- 16 -

and if so, what sanction." In addition, the Court directed briefing on whether, even absent bad faith, a referral to the district's grievance committee was appropriate for "neglect of the matter in a matter entrusted to them," or whether a disciplinary proceeding or monetary sanctions were appropriate. (Tr. 42.)

The Court adjourned the trial to March 6, 2023, and set a conference date for October 12, 2022. (Tr. 44.)

**ARGUMENT**

## I. No Further Sanctions Beyond the Adjournment Already Ordered by the Court are Appropriate Under Rule 16

### A. Applicable Law

Rule 16 of the Federal Rules of Criminal Procedure requires the Government to disclose, upon a defendant's request, evidence that is "within the government's possession, custody, or control," documents that are "material to the preparing the defense"; that "the government intends to use [] in its case-in-chief at trial"; or that are "obtained from or belong[] to the defendant." Fed. R. Crim. P. 16(a)(1)(E)(i)-(iii). "When the government has failed to comply with Rule 16, the district court has broad discretion to determine what remedial action, if any, is appropriate." *United States v. Miller*, 116 F.3d 641, 681 (2d Cir. 1997). The Court may order a party to permit discovery, grant a continuance, prohibit a party from introducing undisclosed evidence, or enter any other order that is just under the circumstances. *See* Fed. R. Crim. P. 16(d)(2)(A)-(D). In considering whether remedial action is appropriate, the Second Circuit has explained that courts should look to "the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." *United States v. Pineros*, 532 F.2d 868, 871 (2d Cir. 1976) (quoting Fed. R. Crim.

- 17 -

P. 16 advisory committee's note to 1966 amendment, reprinted in 39 F.R.D. 69, 178 (1966));
*accord United States v. Sanchez*, 912 F.2d 18, 21 (2d Cir. 1990).

"[A]lthough Rule 16 gives trial judges the option of suppressing evidence as a result of the
government's discovery violations, such a severe sanction would seldom be appropriate where . . .
the trial court finds that the government's violation did not result from its bad faith and that a less
drastic remedy (such as a continuance) will mitigate any unfair prejudice." *United States v.
Marshall*, 132 F.3d 63, 70 (D.C. Cir. 1998), *as amended* (Mar. 6, 1998). "Absent bad faith on the
part of the Government, the preclusion of evidence is rarely an appropriate sanction for discovery
delay." *United States v. Guerrero*, No. 09 CR. 339 (RWS), 2010 WL 1790400, at *1 (S.D.N.Y.
Apr. 30, 2010) (citing *United States v. Marshall*, 132 F.3d at 69); *see also United States v.
Monsanto Lopez*, 798 F. App'x 688, 690-91 (2d Cir. 2020) (continuance of trial after government's
late disclosure of evidence was sufficient to cure any prejudice, even if Rule 16 violation occurred);
*United States v. Graham*, No. 99 Cr. 271 (CFD), 2000 WL 1902425, at *2 (D. Conn. Dec. 21,
2000) (preclusion of evidence not appropriate where government did not act in bad faith and where
"any prejudice to the defendant would be cured by granting her a continuance of the trial date. . . .
A continuance is the least severe remedy necessary to preserve the defendant's right to a fair trial,
promote the fair and efficient administration of justice, and ensure full compliance with Rule
16(a).").

"A district court's decision not to exclude evidence that was the subject of a Rule 16(a)
violation is not grounds for reversal unless the violation caused the defendant 'substantial
prejudice.'" *United States v. Salameh*, 152 F.3d 88, 130 (2d Cir. 1998); *see also United States v.
Lee*, 834 F. 3d 145, 158 (2d Cir. 2016). Substantial prejudice "mean[s] more than that the statement
was damaging to the defendant: the defendant must demonstrate that the untimely disclosure of

- 18 -

the statement adversely affected some aspect of his trial strategy." *United States v. Adeniji*, 31 F.3d 58, 64 (2d Cir. 1994). Specifically, "Rule 16 is concerned with the prejudice resulting from the government's untimely disclosure of evidence, rather than with the prejudice attributable to the evidence itself." *Sanchez*, 912 F.2d at 23.

### B. Discussion

The continuance already granted by the Court in this case is the appropriate remedy for the Government's inadvertent late disclosure of Rule 16 discovery materials. Further sanctions to preclude evidence, dismiss charges, or against individual government attorneys would not be appropriate or warranted.

While Rule 16 provides the Court wide latitude in fashioning a remedy, the applicable case law and rules counsel that the reasons for the late disclosure, the extent of prejudice from the late disclosure, and the feasibility of curing the disclosure with a continuance all support the conclusion that the lengthy continuance granted by the Court in this case is the adequate and appropriate remedy here. *See, e.g.*, *Pineros*, 532 F.2d at 871; Fed. R. Crim. P. 16 advisory committee's note to 1966 amendment.

The Government's late productions were not the result of bad faith. Indeed, defense counsel has not suggested that there was bad faith, and the Court has stated that "[t]here's not evidence of bad faith." (Tr. 29-30, 38.) Nor were the late disclosures the result of a careless or unprofessional approach to the Government's discovery obligations. The Government intended to timely produce all of the relevant documents to the defense shortly after indictment; and the Government took deliberate and organized steps to do so, consistent with the Office's discovery processes and procedures. When the assigned AUSAs uncovered inadvertent errors in the discovery process, they immediately sought to rectify them, identified the materials as newly produced to the defense, and

informed the Court of the relevant facts. In two of these three incidents, the AUSAs discovered the errors themselves and immediately produced the relevant materials within a day. In the third incident, involving the LEEBA Subpoena Returns, as soon as the AUSAs were alerted by defendant Brown's counsel that a drive the Government had provided approximately eleven months earlier did not include all of the materials it was supposed to include, the Government reproduced those materials the same day, and also wrote to the Court that same day. (*See* Exhibit 3 (Dkt. No. 130).)

In these circumstances, the continuance of approximately eight months (until March 2023) remedies any prejudice caused to the defendants by the delay in disclosure, and further sanctions are not appropriate. *See, e.g.*, *Monsanto Lopez*, 798 F. App'x at 690-91 (continuance of trial after government's late disclosure of evidence was sufficient to cure any prejudice, even if Rule 16 violation occurred). Although the relevant materials are undoubtedly voluminous, they have been produced in a text searchable, database loadable format, and the defense will have ample time to review the materials and make any additional motions that they may contemplate pertaining to the new materials. The adjournment the Court granted was even longer than defendants stated they might need. (*See* Tr. 37 (Brown's counsel: "if we go forward with the documents included, that's going to require a substantial adjournment. . . . Probably four, five or six months.")). Any prejudice the defense suffered from the late disclosure of materials will be cured by the lengthy adjournment.[10]

---

[10]    While the adjournment adversely affects the timely administration of justice—and indeed the Government had opposed prior adjournment requests from the defendants (Dkt. No. 123)—the adjournment meaningfully remedies any prejudice from the late disclosure of evidence. And while at the hearing defendant Brown suggested that the adjournment in some way favors the Government, the principal beneficiary of the adjournment is the defendants, both of whom had previously requested (and been denied) adjournments until after Labor Day earlier in the matter

For the same reasons, evidentiary sanctions, such as preclusion of the late-disclosed materials, are not appropriate in these circumstances. As courts broadly recognize in circumstances like those presented here—where late disclosure is not the result of bad faith and an adjournment cures any prejudice—severe sanctions like preclusion are not appropriate. *See Marshall*, 132 F.3d at 70 ("[S]uch a severe sanction" as suppressing evidence "would seldom be appropriate where . . . the trial court finds that the government's violation did not result from its bad faith and that a less drastic remedy (such as a continuance) will mitigate any unfair prejudice."); *Guerrero*, 2010 WL 1790400, at \*1 ("Absent bad faith on the part of the Government, the preclusion of evidence is rarely an appropriate sanction for discovery delay."); *Graham*, 2000 WL 1902425, at \*2 (preclusion of evidence not appropriate where government did not act in bad faith and where "any prejudice to the defendant would be cured by granting her a continuance of the trial date").

While the Court has broad discretion under Rule 16 to fashion sanctions to deter future violations, and the Government, like the Court, wants to avoid such production errors in the future, further sanctions beyond adjournment are not necessary or appropriate to deter such errors by the assigned AUSAs or the Office. It is true that the assigned AUSAs oversaw a production process that resulted in errors that had serious consequences, leading to a lengthy adjournment of trial. Yet it is also true that these same AUSAs started preparing for discovery months before the defendants were indicted, with the clear goal of producing all discoverable materials in a complicated matter involving many hundreds of thousands of pages and hundreds of categories of materials. In this context, they made diligent efforts to achieve their goal of full production, including giving specific instructions to the litigation support personnel assisting the AUSAs and regularly

---

(Dkt. Nos. 107, 119), and who will now have more time to review materials and prepare a defense. Moreover, given that witness memories invariably fade with time, and most of the relevant events occurred more than three years ago, an adjournment does not inure to the Government's benefit.

supervising their work. The AUSAs did not simply complete discovery and move on, but continued to review materials to ensure they appropriately oversaw that task as the case progressed.

The U.S. Attorney's Office and the AUSAs assigned to this case strive to hold themselves to the highest standards. We recognize that despite our best efforts, we have made errors. When the AUSAs identified errors in this case (two of which were discovered by the AUSAs themselves), the AUSAs promptly corrected them and notified the parties and the Court. [11] These same AUSAs have also learned from these errors and have suggested systemic improvements to the Office. And the Office is committed to identifying documents of interest for the defense and to producing the balance of 3500 material and an exhibit list well in advance of trial, to further ameliorate any potential prejudice to the defense.

In these circumstances, sanctions against the attorneys are not necessary to ensure that the Office and the assigned AUSAs honor and follow the rules governing criminal discovery or the profoundly respected traditions and ideals of the Office. Indeed, since even before the June 30 hearing, the assigned AUSAs, their supervisors, executive staff, and members of the Disclosure and Technology Committees have held in-depth discussions about the errors that occurred here and how the Office can implement systemic improvements to better fulfill its commitment to the highest standards in the discovery production process. As part of these efforts, the assigned AUSAs have helped identify parts of the production process that need to be improved to avoid similar

---

[11]     With respect to the last error, the failure to include the LEEBA Subpoena Returns in Production 10A to defendant Brown after he was added to the case, the Government attorneys had no ready way to uncover the mistake. Defendant Brown—and not the Government—was in possession of the hard drive with the missing materials, and the Government had sent cover letters and an index indicating (mistakenly) that those materials were included. The Government makes this observation not to suggest that the responsibility for the late discovery of the error lies with Brown, but merely to recognize that the AUSAs could not easily uncover the error after it occurred because they could not inspect the hard drive.

errors. The AUSAs also have shared the errors that occurred here and ways to avoid them in the future with executive staff and at a meeting with the AUSAs and paralegals in the Unit that supervises this case. The assigned AUSAs are also working with the Office to share both the errors here and the lessons from this case with other Units and/or those Units' supervisors, and will coordinate with the Office's Disclosure and Technology Committees to help improve the discovery production process. In addition, the AUSAs and senior members of the Office are committed to working together to ensure that the lessons learned in this case will be incorporated into paralegal trainings going forward.

While undoubtedly members of the Office have made mistakes in the past, including before this Court in *United States v. Jain*, No. 19 Cr. 59 (PKC), 2020 WL 6047812 (S.D.N.Y. Oct. 13, 2020), the U.S. Attorney's Office has drawn lessons from those cases and established trainings and policies designed to prevent those sorts of mistakes from happening again. (*See, e.g.*, Letter from Acting U.S. Attorney Audrey Strauss, Dec. 18, 2020, in *United States v. Jain*, 19 Cr. 59 (PKC), Dkt. No. 151.) In recent years, the U.S. Attorney's Office has established the Disclosure Committee and a Technology Committee, both of which draw their members from line AUSAs and the executive staff, to address discovery issues, provide guidance to AUSAs and litigation-support personnel, and work to address the increasing and rapidly evolving technological challenges the Office faces in connection with document cases and document production. And while the consequences of the errors in this case were highly regrettable, those errors did not implicate any of the systemic root causes of the issues implicated in *Jain*. *See Jain*, 2020 WL 6047812 at *12 n.6 (citing the call for "systemic solutions" in *United States v. Sadr Hashemi Nejad*

- 23 -

487 F. Supp. 3d 206, 213-14 (S.D.N.Y. 2020) ("*Sadr*"),.[12] Here, the relevant AUSAs were assigned

to this investigation and case since its inception; they were in close coordination with the

investigating agencies on discovery, took methodical steps to obtain all such materials from the

investigating agencies, and did obtain them; they intended to produce all relevant materials, and

issued specific instructions to have those materials produced; they took substantial steps to uncover

errors themselves (identifying two of three through their own unprompted re-review of discovery

materials) and then immediately produced those materials to the defendants; they immediately

explained their errors in detailed letters to the Court and to the defense and identified the discovery

as newly-produced; and they promptly corrected inaccurate statements they had previously made

---

[12]    In *Sadr*, Judge Nathan listed the following precipitating factors, none of which was a factor
in this case, in part because of reformed procedures within the U.S. Attorney's Office:

> 1. The sheer number of prosecutors who worked on this case
> (fourteen total—seven line prosecutors, one Special Assistant
> United States Attorney (SAUSA), and six supervisors;
> 2. The frequency with which different prosecutors subbed into and
> out of the case;
> 3. The number of AUSAs on the trial team (this case was tried by
> four Government lawyers);
> 4. A failure to coordinate and effectively communicate with the
> Manhattan District Attorney's Office;
> 5. Failures to communicate between the AUSAs and the Special
> Assistant United States Attorney appointed from DANY;
> 6. Breakdowns in communication between the FBI and line
> prosecutors, including regarding the FBI's investigation of this case;
> 7. Insufficient training of FBI agents and AUSAs on appropriate
> limits to searches of electronic search-warrant returns;
> 8. Insufficient training for all participating AUSAs and the SAUSA
> on disclosure obligations;
> 9. Insufficient policies in place that ensure timely and complete
> compliance with disclosure obligations; *and*
> 10. Insufficient supervision of disclosure obligations by the USAO's
> Unit Chiefs.

*Id.* at 213-14 (citations omitted) (emphasis in original).

to the Court, when they mistakenly believed that all discovery had been produced as they had intended and directed.

In short, while the consequences of the errors here were significant, the underlying errors do not concern whether Government attorneys knew or understood their discovery obligations or failed to give those obligations proper attention. Rather, they consisted of a series of human and administrative errors in a government office with limited resources but a highly dedicated staff that is committed to doing its best to fulfill its discovery obligations; to understand, fix, and fully disclose errors when they occur; and to strive to perform better.

Moreover, even before such problems were uncovered in this case, the Office's leadership had been working to address several of the problems that lay at the root of the errors here, with the aim of avoiding such errors going forward. For example, after significant effort, the U.S. Attorney's Office recently obtained approval and funding to more than triple the Office's ability to transfer data to and from internal shared directories to the cloud, so that more discovery materials can reside in a single, centralized location. These enhanced computer capabilities are aimed, in part, at reducing the sorts of space limitations that required materials in this case to be stored in separate places, as described above. The Office's hope and expectation is that such improvements will help to prevent the sort of errors that occurred when Production 10A to defendant Brown inadvertently omitted the LEEBA Subpoena Returns, which had been saved only on the Relativity Database and a standalone hard drive (and not a shared drive) because of space limitations on the Office's shared drives.

In addition, the Office is designing and currently testing systems and software to better track both the intake and reproduction of electronic evidence, including subpoena returns and search warrant returns, with the aim of helping foreclose the sorts of problems that arose in the

failure to download the Koenig Series. The Office also has recently hired staff to augment its litigation support unit, including a digital evidence technician.

Finally, as explained above, the assigned AUSAs and the Office have noted several contributing issues that are relevant to the errors here, and have shared with supervisors and members of the Office's executive staff the lessons that can be drawn. The assigned AUSAs are further working with supervisors and the Office's Technology and Disclosure Committees to implement systemic improvements and a plan to share these reforms broadly with AUSAs, paralegals, and IT staff, in order to minimize the risk of similar errors in the future.

These remedial lessons include: (i) when materials are too large to be stored on the internal shared drive, a notation should be made in the relevant shared drive folder to alert others to the existence of materials located elsewhere (as was done at times in this case, but not in all instances); (ii) AUSAs should ensure a process for litigation support personnel to quality-check their work, particularly with respect to saving and copying materials for discovery production; and (iii) AUSAs should ensure that they and paralegals are aware of, keep track of, and quickly organize materials that the IT Department downloads into internal shared drives.

Ultimately, though, all systems and processes are only as good as the efforts of the people who implement them. Here, the assigned AUSAs intended to produce a large and diverse amount of discovery to all the defendants and began efforts to do so early in this case. They worked diligently and systematically to oversee the process of preparing, copying, and producing discovery. When the three errors at issue here were uncovered, the AUSAs took immediate steps to rectify the omissions and to provide fulsome and accurate reports to the Court, and have committed to working with the Office's Disclosure and Technology Committees so that these lessons will be incorporated in improving processes for AUSAs and paralegals going forward.

Under these circumstances, sanctioning the AUSAs individually or the U.S. Attorney's Office as a whole is not necessary or warranted.

## II.    No Further Sanctions Beyond the Adjournment Already Ordered by the Court Are Appropriate Under Rule 5(f)

### A.  Background and Applicable Law

The Due Process Protections Act, Pub. L. No 116–182, 134 Stat. 894 (Oct. 21, 2020), amended Rule 5(f) of the Federal Rules of Criminal Procedure to provide that:

> In all criminal proceedings, on the first scheduled court date when both prosecutor and defense counsel are present, the judge shall issue an oral and written order to prosecution and defense counsel that confirms the disclosure obligation of the prosecutor under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, and the possible consequences of violating such order under applicable law.

Fed. R. Crim. P. 5(f)(1). The Rule also mandates that each judicial council shall promulgate a model order to implement this rule. Rule 5(f)(2).[13]

On October 28, 2020, with respect to defendants Wynder and Whittick, this Court entered this District's model Rule 5(f) order, "to confirm the government's disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, and to summarize the possible consequences of violating those obligations." (Dkt. No. 18.) That Order provides that the Government must disclose all *Brady* materials "promptly after its existence becomes known to the

---

[13]    Prior to enactment of the Due Process Protections Act, more than 38 federal districts, though not this District, had a local rule or standing order confirming the prosecution's obligations to disclosure *Brady* and/or *Giglio* material. *See* Federal Judicial Center, *A Summary of Responses to a National Survey of Rule 16 of the Federal Rules of Criminal Procedure and Disclosure Practices in Criminal Cases* (Feb. 2011), at https://www.uscourts.gov/sites/default/files/rule16rep_2.pdf.

The Federal Judicial Center's survey also noted that the most common remedial steps taken by trial courts for a disclosure violation involved ordering disclosure and a continuance. Only in the rarest of circumstances, less than approximately 2% of cases, did judges or defense attorneys report that the violation resulted in holding a prosecutor in contempt or reporting the prosecutor to the DOJ Office of Professional Responsibility or to the State Bar. *Id.* at Appendix C-18 (Table 26).

government so that the defense may make effective use of the information in the preparation of its case" and must disclose any *Giglio* materials "sufficiently in advance of trial in order for the defendant to make effective use of it at trial or at any such other time as the Court may order." (*Id.* at 1.) That Order further provides:

> If the government fails to comply with this Order, the Court, in addition to ordering production of the information, may:
>
> (1) specify the terms and conditions of such production;
>
> (2) grant a continuance;
>
> (3) impose evidentiary sanctions;
>
> (4) impose sanctions on any responsible lawyer for the government;
>
> (5) dismiss charges before trial or vacate a conviction after trial or a guilty plea; or
>
> (6) enter any other order that is just under the circumstances.

(*Id.* at 2.) A similar Rule 5(f) order was entered with respect to defendant Brown on July 12, 2022, by United States Magistrate Judge Katherine H. Parker, who presided over Brown's presentment on referral from this Court. (Dkt. No. 48.)

This Court orally reconfirmed its Rule 5(f) Order with respect to defendants Wynder and Whittick during a video court conference on February 23, 2021 (Tr. 2-3), and reaffirmed the Government's understanding of its *Brady* and *Giglio* obligations with respect to both Wynder and Brown at subsequent conferences on October 14, 2021 (Tr. 17) and February 15, 2022 (Tr. 17-18).[14]

---

[14]    Although the transcript bears the date February 2, 2022, the Government believes that the correct date is February 15, 2022, as reflected on the docket sheet and minute entry for that date.

**B. Discussion**

Although the case law construing the new Rule 5(f) is still limited, the Government submits that the remedies and sanctions for a violation of Rule 5(f) should be applied consistently with the case law governing sanctions for a Rule 16 violation under Rule 16(d)(2), and the facts and circumstances here do not support a sanction more severe than a continuance.

As an initial matter, based on the Government's review of the relevant discovery materials, we have not identified any *Brady* materials within the late-produced Rule 16 discovery at issue here. Nonetheless, based on our preliminary review of the discovery materials at issue, there appear to be some documents in categories that we understand the defendants may consider favorable to the defense, based on the defendants' prior letters and briefing, such as minutes of meeting of LEEBA's board of directors and emails and other documents related to the audits of the Annuity Fund by the Koenig Firm.

In the ordinary course, the Government is under no legal obligation to seek out and identify such categories of materials within discovery that is otherwise produced to the defendants. *See, e.g., United States v. Ohle*, No. 08 Cr. 1109, 2011 WL 651849, at *4 (S.D.N.Y. Feb. 7, 2011) ("[T]he Government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence."), *aff'd*, 441 F. Appx. 798 (2d Cir. 2011) (internal quotation marks omitted). However, the Government will, under the unique circumstances here, consistent with the Government's approach to discovery throughout this case (which included, for example, early production of many witness statements) and with an aim to remediating the errors, undertake certain voluntary steps to assist the defense in reviewing the now-produced documents. In this regard, the Government has begun a review for categories of materials that we believe the defendants may find potentially of interest based on prior correspondence and briefing, and the Government will identify those categories of materials for the defendants substantially in advance

- 29 -

of trial.[15] The Government further intends to produce an exhibit list at least one month before trial (which is substantially in advance of when the defendants would have received it under the initial trial date), in order to further assist the defendants in their pre-trial preparations.

In addition, even assuming *arguendo* that the late-produced Rule 16 discovery contains some material "favorable to an accused," *i.e.*, material subject to the Rule 5(f) order, the appropriate sanction would be the one already granted: a continuance. This is so for largely the same reasons set forth above, namely, the errors here were inadvertent; the materials were not intentionally concealed and were produced immediately upon the uncovering of the errors; and the AUSAs sought conscientiously and carefully to fulfill their *Brady, Giglio,* and discovery obligations, and attempted to ensure compliance with those obligations throughout the process. Moreover, additional sanctions would be particularly inappropriate here, where the AUSAs not only committed early to a full production, but also at all times acted in good faith and did not intentionally suppress any materials but rather uncovered errors themselves and immediately informed the Court of materials that were in their possession that had not been timely produced as intended.

Further, as the Court is aware from prior briefing in this case, the Government is cognizant of its disclosure obligations under *Brady* and *Giglio* and has taken a conscientious approach to early disclosure of witness statements and non-Rule 16 discovery. (Gov't Mem. in Opp'n to Pretrial Motions of Def. Brown at 18-19, 24; Dec. 15, 2021 (Dkt. No. 87).) For example, even

---

[15]    The Government does not (and could not) intend this to be a comprehensive accounting of all documents within the produced materials that the defense may view as of interest; such an accounting is neither legally required nor practical, given, *inter alia*, that the Government does not have full visibility into the intended defense(s).  Rather, the Government voluntarily undertakes this review with the intent of assisting the defense in their review of the materials, which the defense now has eight months in advance of the new trial date to do.

after the Court orally denied without prejudice defendant Brown's motion for early disclosure of FBI 302 reports of witness statements that the Government had produced in redacted form (Tr. 20-21, Feb. 15, 2022), the Government provided these materials in unredacted form on May 27, 2022, more than six weeks in advance of the then-scheduled trial date of July 13, 2022.

And while the deadline for the production of 3500 and *Giglio* material—10 days before trial—had not yet arrived when the Court adjourned the trial on June 30, 2022, the Government had already produced a substantial amount of 3500 and *Giglio* material earlier as part of an agreement with defendants regarding stipulations. As for the limited number of remaining witnesses for whom the Government had not yet produced 3500 material when the trial was adjourned, as a further demonstration of the Government's good faith and efforts to remediate any hardship caused by late-produced documents, the Government intends to produce that material at least one month before the new trial date (which is substantially earlier than the 10 days the Court had previously ordered) along with an exhibit list.

Lastly, the nearly eight-month adjournment ordered by this Court on June 30, 2022, not only mitigates any potential prejudice from the late disclosure of Rule 16 discovery, or of any potential *Brady* material, but also provides the defense with an exceptionally long time to review and prepare for trial with the benefit of the Government's early disclosure of 3500 material and witness statements for many of the witnesses in this case. Thus, even assuming an unintentional violation of the Rule 5(f) order resulting from the failure to produce the materials at issue—given the lack of bad faith here, the Government's good-faith approach to discovery in this case, and its efforts to remediate and improve its processes—the adjournment already ordered is a sufficient sanction to cure and to address the inadvertent discovery errors in this case.

### III.   A Referral to the District's Grievance Committee Is Not Appropriate Because the AUSAs Did Not Fail to Meet Their Ethical Responsibilities

#### A.  Applicable Law

The Court has the authority to refer a case to the District's Committee on Grievances. Upon a referral, and after notice and an opportunity to respond, the Committee may impose discipline if the Committee finds "by clear and convincing evidence" "in connection with activities in this Court, any attorney is found to have engaged in conduct violative of the New York State Rules of Professional Conduct as adopted from time to time by the Appellate Division of the State of New York." Local Civil Rule 1.5.[16]

As relevant here, "[a] lawyer shall act with reasonable diligence" and "shall not neglect a matter entrusted to the lawyer." N.Y.S. R.P.C. Rule 1.3. Furthermore, "[a] lawyer with direct supervisory authority over a nonlawyer shall adequately supervise the work of the nonlawyer, as appropriate." *Id.* Rule 5.3. Although the section setting forth the "Scope" of the Rules of Professional Conduct was not adopted in New York, that section sets forth instructive guidance regarding attorney discipline: the Rules "presuppose that whether discipline should be imposed for a violation, and the severity of a sanction, depend on all the circumstances, such as the willfulness and seriousness of the violation, extenuating factors and whether there have been previous violations." N.Y.S. R.P.C Scope.

---

[16]   "Local Civil Rule" refers to the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York. "N.Y.S. R.P.C." refers to the New York State Rules for Professional Conduct, available at https://www.nycourts.gov/ad3/AGC/Forms/Rules/Rules%20of%20Professional%20Conduct%2022NYCRR%20Part%201200.pdf.

**B. Discussion**

The errors here did not occur due to bad faith. And there is no evidence of bad faith. (*See* June 30, 2022 Tr. 29-30, 38.) Nor is there any basis to conclude that the AUSAs failed to exercise "reasonable diligence" or "neglect[ed] a matter entrusted to [them]."

The Government readily acknowledges, and takes responsibility for, the three production errors that occurred here. At the same time, as the foregoing demonstrates, the AUSAs applied a deliberate process to producing discovery in this case, including all of the attendant steps in order to identify, collect, review, organize, copy, and produce materials. The record further reveals that, when each of the three discovery errors was uncovered, the AUSAs worked diligently and professionally to remedy those omissions the day they were uncovered, and to inform the Court immediately.

The production errors here do not undermine the conclusion that the AUSAs exercised a professional level of care, especially when considering that the production at issue was substantial, complex, and diverse, and errors occurred within three different collections of documents within 200 other collections of documents that were produced spanning 36 separate productions. Indeed, the inadvertent production errors occurred in the context of complex processes designed to meet the Government's Rule 16 obligations, which was not the result of a failure to act with "reasonable diligence," to "neglect" a matter, or a failure to "adequately supervise the work of [] nonlawyers." To the contrary, the AUSAs regularly worked with paralegals and litigation support staff throughout the process, remaining closely involved in the discovery process at every phase. Nor is there any suggestion in the record of repeated violations of professional norms on past occasions by the assigned AUSAs who oversaw discovery in this case—another factor cited in the section addressing the "Scope" of the Rules of Professional Responsibility. *See* N.Y.S. R.P.C. Scope

("[W]hether discipline should be imposed for a violation, and the severity of a sanction, depend on all the circumstances, such as . . . whether there have been previous violations.") Accordingly, it is not necessary or appropriate to make a referral to the Disciplinary Committee.

Indeed, a look at the cases in which courts in this District and Circuit have referred attorneys to the Disciplinary Committee reveals how far this case is from cases that have been deemed to warrant a disciplinary referral. *See, e.g.*, *In re Jaffe*, 585 F.3d 118 (2d Cir. 2009) (attorney referred to disciplinary committee of the Second Circuit, and removed from the bar of the Second Circuit, based on clear and convincing evidence of conduct "unbecoming a member of the bar," over many cases, including violating various rules and orders of the Court and various disciplinary rules of the New York Lawyer's Code Professional of Responsibility, such as engaging in dishonesty, presenting false statements to the court, filing deficient briefs, aiding the unauthorized practice of law, and engaging in a pattern of neglect of client matters); *In re Agola*, 484 F. App'x 594 (2d Cir. 2012) (attorney subject to "public reprimand rather than any more serious sanction, in light of mitigating factors, based on attorney's failure to comply with scheduling orders in 21 appeals, resulting in the dismissal of seven of those appeals); *In re Roman*, 601 F.3d 189 (2d Cir. 2010) (attorney suspended from Second Circuit for seven months, for conduct including failure to file timely briefs, allowing his partner to submit misleading boilerplate motions under his name, and filed deficient briefs, some of which were submitted without the attorney's review).

In this case, as in every case, the U.S. Attorney's Office and the relevant AUSAs aspire to the highest professional standards, and the Office and the AUSAs regret the three omissions in this case. But the Office and the AUSAs have taken seriously the lessons of *Jain* and *Sadr*, as discussed above, through steps including more robust training, additional hiring of relevant personnel, and

enhanced capabilities. Referral of the AUSAs assigned to this case would not be appropriate based on the facts and circumstances set forth above.

## CONCLUSION

For the reasons set forth herein, the Court should not impose additional sanctions in this case—either substantively within the context of case or through disciplinary sanctions against the individual AUSAs—beyond the nearly eight-month adjournment already ordered.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
David Raymond Lewis
Eli J. Mark
Kedar S. Bhatia
Assistant United States Attorneys
(212) 637-2397/2431/2465